Good morning to all of you. Welcome to our court. At the outset, we, Judge Karnes and I wanted to introduce to you our visiting judge, Judge Paul Kelly, who sits on the United States Court of Appeals for the Tenth Circuit. He sat with us on any number of occasions in the past and we are delighted to have him help us with our work this week. He was appointed to the Tenth Circuit Court of Appeals by President Bush in 1992 and has served with great distinction on that court since then. And so, Judge, we're delighted to have you join us this morning. Two other brief observations for those of you who may not have appeared before us in the past. One, you'll see we have a lighting system and a timing mechanism and it will tell you how much time you have left. As you proceed with your argument, there's a green and amber and a red light. The amber light's a two-minute warning. The red light indicates that your time is up. We'd be much appreciative when you see the red light if you could bring your remarks to a conclusion. It doesn't mean you have to stop dead in the middle of a sentence or a thought, but we'd be much appreciative if you could bring your remarks to a reasonable conclusion. Second observation for you as you proceed with your argument, you may safely assume that we've had a chance to review the briefs, the record excerpts, and in some instances, we've had a chance to look at the record itself. So feel free to go right to the heart of your argument. With that, we will begin with our first case, which is United States v. Sanford Johnson. May it please the Court. Ashley Litwin on behalf of Sanford Johnson III. Today, we're discussing a bunch of objections that were made in front of the district court and preserved on sentencing. The three I'd like to focus on are drug quantity, acceptance of responsibility, the government's decision not to give the defendant the extra point, and obstruction of justice. As to drug quantity, in the supplemental authority that was recently filed before this found, a different panel of the 11th Circuit found that an agent's recitation of co-defendant Sindelic's hearsay testimony was not sufficiently reliable to find drug quantity. Here, the court also relied on an agent's recitation of the same co-defendant Sindelic's hearsay statements to determine drug quantity. Now, of course, they were different hearsay statements. We're talking about different defendants, but they were hearsay statements nonetheless. And as I understand it, from Sholly, is that how you pronounce his name, Sindelic's testimony was quite vague. It was, I give him drugs every other week, every two weeks, whatever he said, and it was quite vague, and the panel thought, you know, that didn't seem very reliable. Here, and as I understand the record, the government had better information than that. They had FedEx shipments and things where they could pretty much estimate how many shipments were sent. Are you saying, Mr. Sindelic, it would have been helpful to hear what he had to say about the number of shipments, or are you also contesting his quantification of the amount he sent on each shipment? Your Honor, I'm only contesting the amount per shipment. So that is the difference between the two cases, roughly is that in Sholly, Sindelic's testimony was used in order to determine the number of packages. Sholly himself had said the quantity per shipment, six pounds, I believe. In our case, the FedEx receipts show 174 packages. But the only testimony relied upon to determine the quantity is Sindelic. He's the only one who says six pounds. And I don't believe, Your Honor, that the court said that it was Sindelic's statements. The vagueness of it is what made them unreliable. It was the fact that it was just this hearsay testimony is what was relied upon, and that there was nothing to corroborate that evidence based upon the record. What are we to make of the testimony from Agent Murphy that Johnson himself said in an interview that Sindelic paid him $100 per pound to receive and deliver the marijuana, and that he, Johnson, made between $600 and $1,200 a week from January or February of the testimony of Sindelic, and provide a basis from which to extrapolate not just the number, but the amount itself? No, Your Honor, because that's per week, not per shipment. And I mean, the conspiracy ended June 2017. So that's roughly about a year and a half, which I did the rough math last week, and I mean, 52 weeks a year, 24 weeks for the other half a year, that's about 76 weeks. So if he made $600 to $1,200 per week, that would be if there were only 76 shipments. But the government is relying, I believe, on 174 shipments. So that figure of how much he made doesn't affect the quantity per shipment. And you figured out from your rough math based on his, on admission, what fence level, what drug quantity he would have been in? Yes, Your Honor. By my rough math, that put him at about a level 24. And what was he sentencing? I believe he was a level 28. Okay, so about four levels difference. Or a level 26. That I would have to, I do have it. I can come back and rebuttal. But yes, it definitely would make a difference, Your Honor. And his admission, again, was to amount received. It wasn't as to quantity. Not only did he object to Sendelec's hearsay, he asked Sendelec to testify, which he wasn't permitted. And he said in his objections— How did that work out? I was reading it. It seemed the defense counsel wasn't real assertive about it. He had called opposing counsel for Sendelec, and he said, well, I don't want to testify. He didn't try to subpoena him or get the court to direct that this person appear, correct? No, Your Honor. He did not do a subpoena. But the government said that he wouldn't testify. They wouldn't waive—I believe it was saying they wouldn't waive his Fifth Amendment immunity. And it is the government's burden at that point. I mean, he objected. He said that sometimes his shipments were just one pound. That was in evidence that there were one pound shipments because it was for his personal use. What is the standard that has to be met? Well, the standard that has to be met, Your Honor, is— By a preponderance, isn't it? Yes, Your Honor, it is preponderance. That's not beyond a reasonable doubt. No, Your Honor. So why isn't there sufficient evidence in that testimony coupled with Standick's testimony, the co-conspirator's testimony? Why isn't that sufficient to meet that low, fairly low standard? Because there was no actual testimony. It was based upon Sendelec's hearsay statements. That was it. Well, are hearsay statements not permitted in a sentencing situation? Well, Your Honor, in a sentencing situation, the court would have to make a finding that those hearsay statements were reliable, and there was no finding. And so absent a finding in a sentencing, what the court can—this court can say that—let me get the exact language—is that it has to be—the reliability has to be apparent from the record. And in this case, Sendelec's hearsay statements were not apparent from the record because there was no other testimony that there were six pounds per shipment. Specifically, Johnson said—and it was also apparent, there was other discussions—that Johnson received lots of personal use marijuana from Sendelec. There was no explanation from the government's testimony which packages that were sent to him that fit the descriptions that they used was for personal use. The personal use you're saying shouldn't count in the counting of the drugs if they were sent to him just for his personal use? Well, Your Honor, I mean, that would be a different argument. I'm more saying that the personal use, he said, was one pound per time. So I'm saying— This is what your client is saying, one pound. That is what the client is saying. Sendelec's never said one pound, but your client says he got some one-pound shipments. But Sendelec did say he sent him stuff for his personal use as well. So Sendelec never said, I sent him 174 packages, they were all six pounds. The government is extrapolating from this FedEx information that all the packages, therefore, were six pounds. Let me go back to the question I asked you before. That is to say the statement from the defendant himself who says in an interview with the agent that Sendelec paid him about $100 a week and he made between $600 and $1,200 per week. Let's say we cut it in half and we go to $900 a week, January or February of 2015 onward, the indictment itself runs through February of—May of 17, if I have that right. I thought it was June, Your Honor, but I think that it doesn't matter. It's May or June. You're talking 28 months. And if you did the extrapolation just that way— I did that, Your Honor. You'd be well over a thousand pounds. Well, no, Your Honor— If that's all you had. Is my math wrong or have I misapprehended something here? When I did the math, Your Honor, again, I assume that was about 76 weeks because, again, it's about a year and a half. I did it by nine and came to 684 pounds, which is 310 kilos. Well, I had 27 months from February of 15 to May of 17. So I just did June, so I did six months, Your Honor. I mean, I think— But I'm just saying, if that were right, if the period of time was from February of 15, because he said it was from January or February, but even if you give him it was February, and even if you say it was 900 bucks rather than six or twelve, and you had 27 months there, you had 112 weeks. If you multiplied it by nine, you'd go over a thousand pounds just that way alone without even considering the Cindelec account. Your Honor, my math didn't get there, but regardless, I think the case law says that the estimate should be conservative. A conservative estimate would move to the 600 to 1,200. It would move to the 600 range, which is what the government was trying to do here, and I think that would change the quantity. I would—I only have 30 seconds left, and I really want to get on acceptance. You go ahead, and you take a moment to address the other matter you wanted. Okay, thank you so much, Your Honor, because this is a really unusual case regarding acceptance of responsibility. Yeah, and it's that issue that I'd like you to zero in on, at least to help me with. Okay. So, Your Honor, unlike typical cases where this court has to give deference to the district court's determination that the defendant didn't get acceptance, here the defendant objected, asked for three levels for acceptance of responsibility, and the court declined. He found—the court found not only that his obstruction of justice was prior to his decision to plead guilty, so shouldn't affect his acceptance, but that he timely agreed to accept responsibility, and therefore, he should get the extra point. It was the government who refused to give it to him. Well, here's the problem— Did you suggest— I'm sorry. Go ahead. Did you suggest to the government or to the court that the reason the government gave was improper? No, Your Honor, I don't believe that. Did you suggest that there was a constitutional basis that you feel was—that was wrong, that was used? I don't believe, Your Honor, that that objection was specifically made. Okay. In the absence of a suggestion, isn't it the responsibility of the government only and not the court to decide on whether to grant the third point? Well, Your Honor, I believe the government has discretion in order to decide whether or not to file the motion based upon only under Amendment 775, under only whether or not the defendant has timely accepted responsibility and the government had to allocate resources. But, no, it is the court has the discretion— Inherent authority. Yes. If there's a question raised about the rationale for the refusal— But, Your Honor, I mean— If the court didn't grant it or the government didn't do it because of an individual's race or religion or whatever, then the court can at least have a hearing on that basis. But if it's not sought, where is the court left? But, Your Honor, I mean, it was sought. The question was brought to the court to say— No, you did not raise any grounds other than the fact you disagreed with the acceptance of responsibility issue. Right, Your Honor, it was objected to. I mean, the lack of getting the extra point— But you did not raise any improper grounds that have been relied upon by the government. Well, Your Honor, they did not say that that was improper, but they did say we timely accepted responsibility. We, therefore, deserve this enhancement under 3E1.1B, which was the relevant criteria. I mean, the court even said to the government, he timely accepted responsibility, and the government agreed. They said he timely accepted responsibility. So, I mean, everybody at that moment agreed that the only thing that matters under 3E1.1B had been determined, had been found in favor of the defendant. He had done what he was supposed to do for the government to file their motion. At that point, the court— Now, again, the court, you can tell from the sentencing hearing, he doesn't believe— the defendant, the one point. But under—after Amendment 775, it seems clear that he does have this discretion. The amendment specifically says that the government should not withhold a 3E1.1B motion based on interests not identified in 3E1.1, such as whether a defendant agrees  as an obstruction of justice, an interest contemplated in 3E1.1. Well, it's not contemplated in 3E1.1B, Your Honor. Oh, I agree with that. Okay. But that's not my question. So, Your Honor, I think— Do you understand why I— Of course. —frame the question more broadly? Yes. If you were limited to interests going beyond what's in 3E1.1B, I think your answer would be clear. Yes. But the reference is not to 3E1.1B, but rather to 3E1.1. 3E1.1. That is to say, the courts may review the government's choice if it was based on an interest not identified in 3E1.1. But obstruction of justice is identified in 3E1.1. Therefore, why would it have been inappropriate for a court to not award the one point based on that? I have no doubt that you are right that the court has the power of judicial review. Otherwise, none of this makes any sense. So that's easy for me. Okay. But I think the problem that I have with your argument is that obstruction is an interest delineated expressly in 3E1.1, and therefore, given the fact that the argument was made that he did obstruct justice, and there was a finding about it, that was a sound basis, given the broad discretion the sentencing judge had to refuse to accord him that one level. Why is that wrong? What am I missing? Okay. I mean, there's two answers to that. The first one, which I'll get to later, is that I believe that the plain language of the statute means we should only look at 3E1.1B. But before that, going to, if we did look at the entire statute as a whole, here, I found that the obstruction of justice did not affect the acceptance. In a different scenario where there was obstruction of justice, maybe a court could find that that was sufficient. But in our record, we have the district court on record saying more than one time that this obstruction of justice did not affect his acceptance because it was before he pled guilty. And so therefore, it shouldn't be considered. But stepping back from that, if you look at 3E1.1B, it just doesn't make sense for the government's motion to be able to be based upon anything in 3E1.1. The construction of it, it says, if the defendant qualifies for a decrease under subsection A, and then there's other things, and the defendant has assisted authorities in the case of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, then we should decrease the offense by an additional level. So this would be requiring the court to look at 3E1.1A two different times in order to put 3E1.1B, the extra point, and that just doesn't make any sense. A precondition of getting to 3B1.1, 3E1.1B, a precondition to getting to the second point in 3E1.1B is that they've already gotten the two points under 3E1.1A. So it just wouldn't make sense to say, okay, you've gotten the two points under 3E1.1A. Now, to get to 3E1.1B, you also, again, it could be because of something under 3E1.1A. Just the statutory construction doesn't make sense. Thanks very much. You have reserved five minutes and we'll give you the full rebuttal. You were answering our questions. Thank you, Your Honor. Mr. Butler, come on up and speak with us. Good morning, Your Honors. Steve Butler for the United States. May it please the Court. We have five claims that were raised. I know we really only talked about two of them. I certainly have something to say about all those claims. I'll just give you an umbrella answer that on the drug quantity, the argument misapprehends the evidence on the disparate treatment argument that misconstrues the law and the three sentencing guideline claims are belied by the plain language of the guidelines at issue. If I may, unless Your Honors have any additional questions at the outset, I'll start maybe in reverse. We had talked about the acceptance of responsibility. I'm afraid that counsel's reading of the new language, I say new, it was promulgated in late 2013 under Amendment 775. I'm afraid that she's reading into the language a language that doesn't exist. That language says that it cabined the United States' decision to not file the motion for the one point for acceptance of responsibility based on, as Your Honor pointed out, any interest under 3E1.1. It's not cabined to a subsection B interest, which we would concede if that were the case. I take it you would agree at the outset that the court has the power to inquire into and review the basis of the government's choice, at least insofar as the government's choice was based on an interest or may have been based on an interest not identified in 3E1.1. Absolutely. Of course, that wasn't the case here. As Your Honor pointed out, that objection was never made. There was never an opportunity to question whether there was an unconstitutional motive or some kind of arbitrary or irrational decision. In fact, I would submit that based on this record that such an argument never would have won the day because our argument was not only rational and constitutionally sufficient. There really wasn't any argument. I'm in suspense whether if the judge had pushed it, you all would have said, yeah, give them the one point. But they went to another topic and the issue never really got joined. Your position is that's really up to the defense counsel to say there's an exception here to the government's power to make this motion and here it is. Defense counsel never said that. I totally agree. Who knows whether we have been put to the test on that, whether we would have just conceded the one point because it wasn't worth the argument. I can certainly see that and the reality having been in the courtroom. But I can also say that if we had a good reason and would have had a good reason to insist on the one point because it would be satisfied by the plain language of Amendment 775. Let's assume for a moment though that we don't have the problems with the lack of a specific objection by defense counsel. Opposing counsel's argument, I think I understand, is B says if the defendant qualifies for a decrease, then you jump right to the timeliness thing. She says that's what we should be focused on. That's the statute or essentially that was the direction that Congress gave in the Protect Act. This commentary where the commission says we look broadly to the whole shebang, that what we really should be looking at is this particular language such that the government can be inquired into if they don't make this motion for any reason other than untimeliness. How do you respond to her argument? In other words, obstruction of justice has already been found. The district court decided that notwithstanding obstruction of justice, he qualified for the two points. Her argument is, okay, that's it. The only thing we have left to talk about is timeliness. What is your response to that? That's belied by the plain language of what's in the application note through Amendment 775. That amendment, the sentencing commission could have said that the United States decision to not move for the extra point is cabined to interest in subsection B, which if that were the case, then we would have no issue here because subsection B concerns the timeliness of the plea, which is not an issue. Clearly, he pled guilty in a timely fashion and that's not in dispute. But it's not cabined to subsection B. It's 3E1.1 generally. As Your Honor pointed out, there are several interests under 3E1.1, which include the timeliness of the plea, but go well beyond that. In fact, the application note is very explicit that timeliness of the plea is not the end-all be-all for that. And significantly, obstruction of justice without a showing of extraordinary circumstances is absolutely a 3E1.1 interest. So our position is that the . . . Is it an interest though if the judge has decided it was extraordinary and therefore it falls out of the equation? I think that if there had . . . and there was no objection, of course. If there had been an objection, if the court had found that it was an extraordinary case, I must say I don't know on what basis that would have been found. This is a very average situation. Well, the judge found it and you didn't appeal. So we have to assume the judge's finding is correct. Of course. Yes, yes. But here we had no finding of extraordinary circumstances, of course, because the issue was never raised by a defense counsel. And of course, the defendant has the burden to demonstrate acceptance of responsibility at every juncture. And they didn't do that there. They didn't make an attempt to show that there were any extraordinary circumstances. I think you need to get off that. The judge decided that that didn't block him. For me, that's the end of that discussion. Okay. Okay. Your Honor. I hope I answered your question. You did. Thank you. I did. I'll just say this. In preparation for this argument, I've looked at cases from all over the country and the other circuits are very much in align with what I've suggested. That commentary, the application note language is not cabinet to subsection B. Our position satisfied that application note. Are we on plain error review on this issue since there was not a specific objection to the reasons the government gave? There was not any objection. You're right. So, you know, in reviewing it, the matter before this argument, I mean, it seems to me that that would be plain error. We did not refer to that in our brief. But upon a second look, it would be a plain error argument in the sense that they've argued that the judge has some sua sponte obligation to raise this, to review it. I haven't seen any support in the law for that whatsoever. Thank you, Your Honor. I'll move on to the question of drug quantity. I'm afraid that the significance of the hearsay testimony about what Mr. Sindelik had to say is not significant. It doesn't loom large the way that it did in Mr. Shiley's case. In this case, you've got 174 packages based on eight different addresses that FedEx and he controlled, and that is not in dispute. There are eight different addresses that comprise those 174 packages. What we were able to prove at the sentencing hearing is that we have been able to verify all of those addresses. Those are actual addresses that he controlled. It looks like you're in good shape on the number of shipments, and I don't think Ms. Litwin disagrees with that. But she's saying that the quantity amount is sometimes he got her client's position, sometimes he got a pound. He didn't get six pounds. And how was your statement from Sindelik reliable enough to establish something different than that assertion? Well, Sindelik's statement was reliable, and we can talk about what he said, but it was consistent with the non-hearsay admission of Mr. Johnson when he was interviewed that Your Honor pointed out early in the argument. And of course, we'll all have to do our own rough math, but according to opposing counsel, it really doesn't get you up to that number, his admission. I believe that it does, and I'm going to tell you why. Because he admitted that he made $100 a pound on marijuana and made between $600 and $1,200 a week from when he began his conspirational activities, which was around February of 2015, about a month or so after he got out of jail. Now, if you do the simple math on that, that's one to two packages a week. If you consider those to be six pound packages, which is absolutely what he was held responsible for to get to his base offense level, and as Your Honor pointed out, that's over a thousand pounds, which gets to the requisite number of kilograms to get to that particular base offense level. Here's why, a couple of things, and I hope this clears it up for the court. We don't know exactly when Mr. Johnson stopped his drug dealing. We don't know. But what we do know is that it continued for about two years. A search warrant was conducted at his house in March of 2017. We have some information from witnesses, and it's in the pre-sentence report, that some of the shipments began to taper off at that point. We don't know exactly when they ended. From our standpoint, what we're really looking at is about two years of packages coming in. Well, at six pounds a package, even at one a week, that's 104 packages in two years. If you've got two packages, which is the upper end of what Mr. Johnson personally admitted to, that's what, 210. He's being held responsible for 174. I can't imagine that with the obligation of Judge Vinson to find that this was a fair and accurate and conservative estimate based on actual financial records, that this could not be beyond reproach. That's how we see it. I also think that what's really significant and what sets this case apart, Mr. Johnson's case apart from that of his co-defendant, Mr. Shiloh, is that you had actual verified addresses where he received these packages. Agent Peckerall testified that in terms of four of those eight addresses, he actually observed text messages from Mr. Johnson to CINDYLEC ordering marijuana to be shipped to four of those addresses. Four other addresses were found on labels that were seized when a search warrant was issued for Mr. Johnson's residence. Those addressees for those homes confirmed that to the agent that they had received marijuana. There's no dispute that he received marijuana at those addresses. Those were eight addresses. We know that for a fact. He received 174 packages splintered out throughout those eight addresses. The agent weeded out packages that weren't likely to have been containing marijuana. I know there's information in that, 30 or 40 pound packages, packages sent to suspicious names, suspicious variations on the names and that sort of thing. The suggestion that this drug quantity, which stems from 174 packages, was in any way dependent on hearsay testimony from Mr. CINDYLEC, I believe is not true. Again, to sum it up, you've got 174 packages based on actual verified, identified addresses that fit the criteria. You've got an admission by Mr. Johnson absolutely consistent with that. You've got packages found at the search warrant. Yes, I think what's significant about Mr. CINDYLEC's testimony or his hearsay testimony that came to the agent is that it just further confirms or buttresses the other information. It's not like Mr. Shiley's case where the hearsay testimony from Mr. CINDYLEC. That prompts me to say, I don't think you were trial counsel, were you? I was not. I mean, this has nothing to do with how we decide this, but I'm just curious when a defendant on a case like this says, you know, I'd like to hear, you say CINDYLEC said it, let's hear from CINDYLEC. I'm curious why the government just didn't put the witness up. We wouldn't have had these briefs. You wouldn't have to be sentencing Shiley. Why that would not be so? It seems to me very imprudent on the part of the government not just to end that issue right then and there. Well, that's a question I don't have a good answer for you on that. I just know that, you know, from my own experience from trying cases in the past is that, you know, you do have some very difficult Fifth Amendment issues. You have no Fifth Amendment issues. I did not understand that. If you had gone to trial on this defendant and Mr. CINDYLEC said, you know what, I don't want to testify at trial. I've got a Fifth Amendment right. I think you'd say, get on the stand or you don't get your 5K motion. I think that Fifth Amendment issue is ridiculous. I understand and what struck me, you know, as an advocate for the United States reviewing this case in preparation for this argument was that, I think one of your honors pointed it out in Ms. Litman's portion of the argument that apparently that was never pushed by Mr. Johnson's counsel in any way. If that had happened, I don't know how that would have come out. It would have been deemed to have been waived or inapplicable. But I do understand the concern. I want you to know I'll pass that on. Absolutely. And I see that I have about 40 seconds left. There are three other claims. I'm going to tell you that the obstruction of justice, I believe, is belied by the plain language. I mean, you've got just a... What about the sentencing disparity? Yeah, the sentencing... That's her argument. Her argument is you all really seem to be angry with her client. Yeah. That's the toughest deal. Yes, Your Honor. Let me... I could say a lot about that, but let me try to go quickly on this, is that the law requires that the... First of all, this Court views with the jaundiced eye these kinds of claims, and it said so. And for good reason, because these claims are awkward. And when you have a defendant raising a sentencing disparity claim under one of the 3553A factors, it's a non-starter for your comparator to have been sentenced after this defendant. That doesn't work. Also, the defendants have to be similarly situated. They were not similarly situated in terms of... They have to be similarly situated, really, in almost all respects. They have different criminal histories. Their offense conduct, the defendant tried to suggest in their briefs that the offense conduct was the same. It was not. They were not similarly situated even in that respect. And to travel on that theory ignores the importance of the calculus behind the federal sentencing guidelines. In fact, in a hypothetical case, you could have two identically similarly situated defendants, but wildly different sentences based on the calculation of the range. Well, the one specific point that opposing counsel makes is why did her client get obstruction of justice for the remark he made, and Brett Brownell, who did something that seemed much more obstructive, trying to blackmail Sendilek, or he taught... Why did Mr. Brownell not get an obstruction of justice enhancement? The quick answer to that, Your Honor, is that, first of all, it wasn't more significant what Brownell did. Second of all, that was pre-indictment conduct. That was... In no way do we condone that, but that was conduct between co-conspirator drug dealers. It's somewhat common. I'll tell you that. You're saying if it's pre-indictment, you can't get obstruction of justice for that? You probably could, but we don't typically, we're not too terribly aggressive with that. What's a game changer for us is when you see conduct after the indictment's been returned and after the district court has imprimatur over the case, and that's exactly what happened here. Mr. Johnson's obstructive conduct, which could be viewed four different ways, occurred after the district court had assumed jurisdiction over the case. We actually had cooperating witnesses who were impacted by this. We had a protective order that Judge Vinson entered that was flagrantly violated that was intended to prevent the very thing that happened in this case. I'll just leave you with this. As to obstruction, as I see it, there are actually four different dimensions to it. Any one individually would have warranted the two points. The flagrant violation of the protective order. They tried to suggest it was a mere discovery order. This was much more than that. I think your honors understand that. You had the threat in and of itself. You also had the dissemination of the cooperation agreement in and of itself. Then you had the combination of a threat with the cooperation agreement. You could look at this four different ways, any of which independently would justify the two-point enhancement. I think we've got your argument. Thank you, your honor. Thank you, counsel. Your honor, starting with the acceptance argument, which I think was what the courts were most interested in, I would like to start with Judge Kelly's point as to what was done or whether it was preserved in the district court. In this case, the defendant objected from the outset asking for three points. He said he timely plead guilty and he therefore deserved it. This was preserved on the record. I think it's creating too high of a burden on a defendant to not only say something, to file an objection. Don't we just ignore the sentencing guideline? What do you mean by that, your honor? Well, the government is the one that's got the responsibility. The obligation is on the defense to suggest an improper motivation for refusing the third point. It's clear that the guideline covers this exact situation. I'm asking you if we just ignore that, say we're not going to look at that sentencing provision. Well, no, of course not, your honor. We shouldn't ignore the guideline, but the guideline says that if certain conditions are met, that the government should ask for this and explains under what circumstances. And in this particular case, the defendant said those conditions were met, the government should ask for this and the government chose not to. And therefore, I do believe it's preserved. I guess I'm not following your argument. Your honor, the argument is... This goes way beyond acceptance of responsibility. This goes directly to the question of whether or not there was a failure of acceptance of responsibility by virtue of these threats. And that's explicitly covered. Well, your honor, I think that that's the second point, which is whether or not the government can rely upon the obstruction of justice in order not to ask for this enhancement. And if the court is inclined to find that the government cannot ask for this enhancement under anything based on 3E1.1, not limiting it just to 3E1.1b, then I think this court should remand it to the district court for the district court to make that determination. Because clearly the district court didn't think the obstruction of justice in this case affected the acceptance of responsibility. And the district court... So why do you suppose the district court rejected giving you the one point? I don't believe the district court understood it had the authority to do so. But he did it. We gave him the two points. Right, but he refused to give you the one point. Why did he refuse to give you the one point? Because the government didn't move for it, your honor. So he labored under the misapprehension that he was without any power to review it. That is what it seems from the record, yes, your honor. Because he says, government, will you give it to him? I think he deserves it. Literally, the court says, I'd like to give him three points. So the only reason he didn't do it is because the government didn't move for it. And that court should have the opportunity to make its own findings and decide whether... You say the only reason because 3E1.1 gives the government discretion. Yes, your honor. That discretion is erroneously employed. Yes. You have relief, but it was not sought. Well, your honor, the relief is simply... I mean, the way that the guidelines are written, it says that the government cannot not seek this one point unless it's based on certain circumstances. And those circumstances here were based upon whether or not they pled timely, and they did. And so therefore, by lodging the original objection, by asking for this extra point, the defendant did all that he should have done to preserve this issue. And the district court wanted to give it to him, but didn't, only because the government didn't move for it. But I'd like to use my last minute to sort of quickly shift into discussing the drug quantity. Yes, your honor, Judge Marcus, I think your math is better than mine. It does seem to be that... Yeah, my math says, one, if there was 174 packages mailed, and two, to eight locations, and they were attributed to Johnson. And two, Johnson himself conceded that he made between 600 and 1,200 bucks a week for each delivery, even giving you the benefit of the doubt that it was limited to 6 pounds per shipment. That comes out to 1,044 pounds. That's 473.3 kilograms, and that's above the 400-kilogram limit. So, and we're reviewing what the district court did here for clear error. Where's the clear error? Well, your honor, the math that you had was, I think you said it would be 127 weeks, right? Well, but I'm just saying, if you start with the packages, that there were 174 packages mailed. Let's start with that. There's no dispute about that. No. And let's assume that the court could properly attribute each of those packages to your client. And then your client says that each package, each time, yielded a profit to me of between 6 and 1,200 bucks. Taking it at 600, it was $100 a pound. By my math, that comes up to over 1,000 pounds. Yes, your honor. Which is well above the 400-kilogram minimum. If that's right, I'm hard-pressed, or even if it's arguably right, I'm hard-pressed to see where the clear error is in the trial court's finding. Well, so I think, your honor, the only reason we're looking at that data is to determine whether or not it's apparent on the record that Sindelec's hearsay testimony of 6 pounds per package is reliable. And the numbers, if we do those weeks the way we did it, which I think you said would be about 127 shipments. Yes, if you made the calculation not based on 174 packages, but simply on the testimony of the defendant himself, or the statement of the defendant himself, you got to 120 or something like that. But, your honor, the testimony of the defendant itself would be about 127 packages, not 174 packages. I understand. But I think that that is really important because it shows that Sindelec's hearsay testimony is actually unreliable because the defendant's own testimony is different than what Sindelec said. Sindelec says that there were 6 pounds per packages and there was 174 shipments. And so, this is the government's burden. The government could have gotten up there and relied only upon Mr. Johnson's testimony to come to a different number. But that's not what happened. The calculation that the government relied upon was Sindelec's testimony. And so, we're only now looking at the evidence to determine whether or not this makes that more apparent from the record. And I think it actually does the opposite. It shows that it was not reliable. Thanks very much. Thank you, your honor. Thank you both for your efforts. We'll take the matter under advisement and proceed to the next case.